IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| J.W. and M.W., on behalf of A.W. | : | CIVIL ACTION |
| v. | : | |
| MEDFORD LAKES BOARD OF EDUCATION | : | NO.  19-20589-JRP-KMW |

### MEMORANDUM

**Padova, J.**                                                             **August 17, 2021**

       Plaintiffs J.W. and M.W. ("Parents"), individually and on behalf of their child, A.W., commenced this action against the Medford Lakes Board of Education (the "District") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.   The case arrives in this Court following the final adjudication of a due process proceeding before a New Jersey Administrative Law Judge (the "ALJ").  Parents challenge the ALJ's decision that the District offered A.W. a free appropriate education ("FAPE") for his sixth-grade school year and that Parents are therefore not entitled to tuition reimbursement for A.W.'s sixth-grade placement at an independent school.  Parents have now filed a Motion for Judgment on the Administrative Record and the District has filed a Motion for Summary Judgment.[1]   For the following reasons, we grant the District's Motion and deny Parents' Motion.

---

[1] Although the parties give different titles to their Motions, in this context, "'the motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.'"  M.A. ex rel. G.A. v. Voorhees Twp. Bd. of Educ., 202 F. Supp. 2d 345, 359 (D.N.J. 2002) (quoting Heather S. by Kathy S. v. Wisconsin, 125 F.3d 1045, 1052 (7th Cir. 1997)), aff'd, 65 F. App'x 404 (3d Cir. 2003).

## I.     BACKGROUND[2]

### A.    Factual Background

At all relevant times, A.W. was a student with a disability, who was entitled to special education and related services under the IDEA.  (Pls.' Stmt. of Facts ("Pls.' SOF") ¶ 13.)  Because A.W. resides in Medford Lakes, New Jersey, the District is responsible for his educational programming.  (Id. ¶ 15.)  A.W. has attended school in the District since kindergarten.  (Def.'s Stmt. of Facts ("Def.'s SOF") ¶ 5.)  At the end of A.W.'s first-grade year, Parents sent the District an audiological report that they had privately obtained and, as a result, the District conducted a speech and language evaluation of A.W.  (Id. ¶¶ 6-7.)  Following that evaluation, the District developed a speech-only Individualized Education Program ("IEP") for A.W.'s second-grade year. (Id. ¶ 7.)

In December 2014, during second grade, A.W. was identified as also having a specific learning disability in reading, and the District therefore developed an IEP that provided for an in-class resource program in English Language Arts ("ELA"), Math, Science, and Social Studies. (Pls.' SOF ¶ 17; Def.'s SOF ¶ 8; Dec. 23, 2014 IEP at OAL 896.)  The in-class resource program was "a general education class with a general education teacher responsible for all of the students together with a certified special education teacher who would be following A.W.'s IEP and delivering the accommodations and modifications that A.W. required."  (Pls.' SOF ¶ 35 (quotation omitted).)

The District prepared and implemented IEPs for A.W. in third and fourth grade as well. (Def.'s SOF ¶¶ 10-11, 15, 22.)   The District's child study team initially recommended a

---

[2] We draw the background facts from undisputed facts in the parties' competing Statements of Fact as well as from undisputed portions of the administrative record.

continuation of the second-grade program for the third-grade year, but the IEP was revised before the school year began to replace the in-class resource program in ELA with 120 minutes per day in a pull-out resource setting with six or fewer students.  (Def.'s SOF ¶¶ 10-11; <u>compare</u> May 6, 2015 IEP at OAL 927 <u>with</u> Aug. 31, 2015 IEP at OAL 978.)  The fourth-grade IEP removed A.W.'s speech therapy, but continued to provide for a daily double period (120 minutes) of ELA in a pull-out resource setting, along with mainstream general education classes with an in-class resource program for Math, Social Studies, and Science.  (May 5, 2016 IEP at OAL 1084; Def.'s SOF ¶ 22.)  In the pull-out ELA setting, the teacher used the Reading Horizons program, which is an Orton-Gillingham based program that uses a multi-sensory approach to dyslexia intervention.  (Def.'s SOF ¶ 30; <u>see</u> Jeanne Tighe Test. at OAL 4926-29 (explaining use of Orton-Gillingham methods for dyslexia intervention).)

In March of 2017, towards the end of A.W.'s fourth-grade year, there was an annual review of A.W.'s IEP.  (Def.'s SOF ¶ 35.)  By this time, A.W. had been "diagnosed or identified with Central Auditory Processing Disorder in the area of decoding and tolerance fading memory; visual tracking, focusing, and teaming issues; dyslexia; and impaired working memory skills."  (Pls.' SOF ¶ 18; <u>see also</u> District's Rpt. of Educ. Eval. at OAL 1689.)  The IEP that the District proposed for A.W.'s fifth-grade year recommended that A.W. remain in the pull-out resource class for 100 minutes of ELA and in an in-class resource program for Math, Science, and Social Studies.  (Mar. 20, 2017 IEP at OAL 1211.)  The IEP also recommended that A.W. participate in an extended school year ("ESY") program in the summer before fifth grade.  (<u>Id.</u> at OAL 1208-10.)

A.W. did not attend the District's ESY program that summer.  (Def.'s SOF ¶ 44.)  Instead, Parents arranged for his participation in the Lindamood-Bell program, a program that provides ELA and reading instruction, but no instruction in Math, Social Studies, or Science.  (M.W. Test.

at OAL 5913-26 (explaining that M.W. researched the Lindamood-Bell Program, brought it to the attention of the District, and ultimately enrolled A.W.); Def.'s SOF ¶ 45.)   A.W. began the Lindamood-Bell program on July 31, 2017, the earliest date that the program could accommodate him.  (M.W. Test. at OAL 5926.)  The 10-week program provided instruction for four hours each day, five days a week, and did not conclude until October of A.W.'s fifth-grade year.  (Aug. 4, 2017 email from M.W. to District at OAL 2411; Aug. 8, 2017 email from M.W. to District at OAL 2410.)  Parents suggested to the District that A.W. attend four half-days of fifth grade in the District each week while he also attended Lindamood-Bell, and Parents actually sent A.W. to a few days of fifth grade in the District in early September of 2017.  (See Sept. 7-8, 2017 emails between M.W. and District at OAL 2415; M.W. Test. at OAL 5942-47.)   However, the District superintendent, citing school attendance policies, determined that A.W. should withdraw from the District roster and re-enroll on a full-time basis when he finished the Lindamood-Bell program in October.  (Aug. 29, 2017 emails between M.W. and District at OAL 2426.)

A.W. returned to the District full time on October 9, 2017.  (Oct. 4, 2017 email from A.W. to District at OAL 2438.)  According to one of A.W.'s special education teachers, Shelly Craig, A.W. had missed a lot of skills that were covered at the beginning of the school year, which she thought would be stressful on a student.  (Def.'s SOF ¶ 63.)   IEP meetings were held on October 19, 2017 and October 27, 2017, and a new IEP was presented at the October 27th meeting.  (Id. ¶¶ 50-51; Oct. 27, 2017 IEP at OAL 1646.)  The new IEP stated that A.W. had "made a difficult transition from the Lindamood Bell Program after several weeks of intensive, one-to-one phonics and reading instruction" and that A.W. "indicated that he . . . feels anxiety in class because he needs help and cannot follow instructions at times."  (Oct. 27, 2017 IEP at OAL 1650.)  The IEP further recounts that "[a]fter continued interruption to his school day due to school anxiety and

4

refusal to go to class, the child study team in conference with [A.W.'s] mother, . . . determined to change his placement in math to a pull-out resource setting so that [A.W.] can receive more individualized instruction due to his anxiety." (Id.)  The child study team ultimately decided, however, to instead restructure the math program in the in-class resource setting, believing that the inclusion setting was more challenging academically for A.W. and "made for a better learning environment for [him]." (Id.)  At or shortly after the October 27th meeting, the District sought and obtained consent to conduct an educational evaluation of A.W., and Parents expressed their intent to have a private neuropsychological evaluation of A.W. conducted by James B. Gillock, Ed.D, ABSNP.  (Def.'s SOF ¶ 52; District Notice of Eval. Plan at OAL 1673 (stating that Parents would share Dr. Gillock's independent evaluation with the District).)

Following its educational evaluation of A.W., the District prepared a December 7, 2017 report of the results.  (Pls.' SOF ¶ 25; see generally District Rpt. of Educ. Eval. at OAL 1678-1690.)  The next day, December 8, 2017, on Parents' initiative, A.W. underwent a preliminary admission evaluation at the Cambridge School, a private school for students with language-based learning disabilities.  (Cambridge School Prelim. Admission Summ. at OAL 1692.)   Three days later, on December 11, 2017, Parents delivered a letter to the District, in which they stated that they intended to unilaterally place A.W. at the Cambridge School in January 2018 if the District did not propose an appropriate program within ten days.   (Pls.' SOF ¶ 28; Def.'s SOF ¶ 49; Dec. 11, 2017 Ltr. at OAL 1720-21.)  Parents stated in that letter that, in consultation with Dr. Gillock, they had concluded that the education offered in A.W.'s IEP was inappropriate, citing A.W.'s "extremely slow progress in reading," his need for a "program that integrates language and literacy throughout the school day and provides specialized approaches to reading and writing," the

necessity of "a small student:teacher ratio and quiet classroom environment," and his increased school-related anxiety and school avoidance.  (Id. at OAL 1720.)

On December 18, 2017, the District prepared an Eligibility Conference Report Re-Evaluation and developed a new IEP for A.W.  (Pls.' SOF ¶ 30;  Elig. Conf. Rpt. Re-Eval. at OAL 1724-28;  Dec. 18, 2017 IEP at OAL 1730a-55.)   The District did not yet have the neuropsychological exam report from Dr. Gillock, which Dr. Gillock did not complete until January 4, 2018.  (See Jan. 4, 2018 Gillock Rpt. at OAL 2535.)  The new IEP outlined "extensive" modifications, supplementary aids, and services for A.W. in the Social Studies, Math, and Science general education classrooms.  (Pls.' SOF ¶ 32.)   In addition, consistent with prior years, the District determined that A.W. should be placed in an in-class resource program for Math, Science, and Social Studies, and in a pull-out resource class for 100 minutes of ELA each day.  (Pls.' SOF ¶ 34; Dec. 18, 2017 IEP at OAL 1745.)   The IEP also recommended 20 minutes of in-school counseling each month to address A.W.'s anxiety.  (Dec. 18, 2018 IEP at OAL 1733, 1745.)  The revised IEP was sent to Parents on December 18, 2017.  (Dec. 18, 2017 Ltr. from District to Parents, OAL 1756.)

After receiving the revised IEP, Parents unilaterally placed A.W. at the Cambridge School for the remainder of the 2017-2018 fifth-grade school year, from January 2018 to June 2018.  (Pls.' SOF ¶ 45.)  Later in January, the District received Dr. Gillock's report, in which Dr. Gillock made a number of recommendations for A.W.'s education.  (See generally Jan. 4, 2018 Gillock Rpt., OAL 2535-2602.)  Dr. Gillock first recommended that A.W. was in need of an emotionally safe and supportive educational environment, and needed teachers who speak slowly, are patient, and are quick to reinforce students.  (Id. at OAL 2576.)  He also recommended that A.W. needed an educational placement where he would be exposed to "multiple, intensive, and sequential Orton-

Gillingham based multi-sensory approaches to remediating reading, spelling, [and] written expression disorders." (Id.)  Third, Dr. Gillock recommended that A.W. receive extended school year services, where the same Orton-Gillingham multi-sensory approaches were used and where a familiar school counselor, social worker, or psychologist was available.  (Id. at OAL 2576-77.) Fourth, Dr. Gillock recommended that A.W. be placed in a special education setting "with a small student-to-staff ratio of no more than eight (8) students to one (1) teacher with the total number of persons in the classroom limited to nine (9)."  (Id. at OAL 2577.)  Fifth, he recommended that A.W.'s educational program provide A.W. access to a counselor, school social worker, or school psychologist for counseling on an as-needed basis.  (Id.)  Sixth, Dr. Gillock recommended that A.W. needed to be in an "educational program where the staff and the administration [were] willing to implement the kinds and types of approaches and methodologies [that he] recommended."  (Id.)  And, finally, Dr. Gillock recommended that A.W.'s large classrooms be outfitted with an FM sound field system.  (Id.)

On June 4, 2018, the District convened an IEP meeting to develop an IEP for A.W.'s 2018-2019 sixth-grade year (the "2018-2019 IEP").  (Pls.' SOF ¶ 46.)  In the 2018-2019 IEP, the District proposed removing the in-class resource program for Social Studies and Science that it had provided to A.W. during every other year of special education.  (Id. ¶ 47; 2018-2019 IEP at OAL 1776.)  While the Social Studies and Science classes in which the District would have placed A.W. were, in fact, in-class resource classes, the draft IEP did not specify that this was the case and did not provide for a special education teacher to deliver A.W.'s accommodations in that setting.  (See 2018-2019 IEP at OAL 1783; Tighe Test. at OAL 5151-52 (stating that she observed the classes A.W. would have been in for sixth grade, which included an in-class resource Social Studies classroom); Gillock Test. at OAL 5612 (testifying that A.W. was placed in an in-class resource

support classroom for social studies); ALJ Op. at OAL 3851 ("Dr. Lee testified that both petitioners' experts . . . were advised that A.W. would be in an in-class resource class for Social Studies and Science.").)  The 2018-2019 IEP also reflected that A.W. would be receiving 150 minutes of pull-out resource ELA, but this was a typographical error because the sixth-grade curriculum offers only one 48-minute period of ELA and, in fact, A.W. would only receive 48 minutes of ELA instruction daily.  (Def.'s SOF ¶¶ 70-71; 2018-2019 IEP at OAL 1776.)  The 2018-2019 IEP also stated that A.W. would be "provided with a multi-sensory, direct instruction decoding program 2x/wk for 50 minutes in addition to his [pull-out resource] reading classes." (2018-2019 IEP at OAL 1782.)  This supplemental instruction would be Wilson instruction, which is a branded approach to dyslexia intervention that is grounded in Orton-Gillingham principles. (Def.'s SOF ¶ 73; Tighe Test. at OAL 4927-28.)  However, the IEP did not reflect—and Parents were not told at the meeting—that the Wilson instruction would be one-to-one.  (Pls.' SOF ¶ 132.) According to Dr. Michael Lee, the District's Director of Special Education, the District made a decision to provide one-to-one Wilson instruction to A.W. after the IEP was drafted.  (Id. ¶ 131.) The proposed IEP also did not offer A.W. any speech-language therapy.  (Id. ¶ 103.)

In a letter to the District dated July 12, 2018, Parents stated that they believed that the June 4, 2018 IEP was insufficient to meet A.W.'s needs.  (July 12, 2018 Ltr. at OAL 1918-19.) According to Parents, "[t]he supplemental reading program intended to address [A.W.'s] dyslexia [was] not offered with fidelity or with sufficient frequency, intensity, and duration," and the overall program would "decrease the level of support that [A.W.] would receive" and would require A.W. "to continue to work daily with a different reading curriculum in his Language Arts class."  (Id.) Parents asserted that A.W. had "flourished" at the Cambridge School, was "no longer anxious about attending school," and was "finally able to read and has the supports and specially designed

instruction he needs throughout his school day." (Id. at OAL 1918.)  Parents opined that the

District "simply is not equipped to provide the language-intensive, specialized instruction from an

entire school trained to meet the needs of students with language-based learning disabilities that

has finally given [A.W.] the programming he needs to achieve at a level consistent with his

cognitive abilities." (Id. at OAL 1919.)  Parents requested that the District accept the letter as

formal notice that if an appropriate program was not offered within ten business days, they would

unilaterally place A.W. at the Cambridge School for the 2018-2019 school year. (Id.)  Upon receipt

of Parents' letter, the District did not contact them to discuss the in-class resource program. (Pls.'

SOF ¶ 119-120.)  Parents subsequently enrolled A.W. in the Cambridge School for the sixth grade

on September 4, 2018. (Cambridge School Enrollment Rpt., OAL 1760-63.)

 After A.W. had returned to the Cambridge School in the fall of 2018, Dr. Gillock and

another professional hired by Parents, Jeanne Tighe, M.A., CCC-SLP, CDP, visited the District to

observe its programming. (Tighe Test. at OAL 5151; Gillock Test. at OAL 5658-59.)  Ms. Tighe

observed the classes that A.W. would have been in if he were attending sixth grade in the District,

including the pull-out replacement ELA class, the in-class resource Social Studies class, and the

supplementary instruction in reading class. (Tighe Test. at OAL 5151-52.)  She concluded that

the Wilson instruction that the District offered was "perfectly competent," but she took the position

that the instruction should be one-to-one for 60-75 minutes twice per week, and noted that A.W.'s

2018-2019 IEP instead provided for small group instruction in 50-minute sessions twice per week.

(Id. at OAL 5199-5200.)  She testified that she observed writing instruction in the pull-out ELA

class, described the instruction as "top down," and opined that "bottom up" instruction is "far more

productive" than top down instruction for students with language-based learning disabilities. (Id.

at OAL 5167.)  She further opined that the grade level writing instruction was beyond A.W.'s

capabilities.  (Id. at OAL 5167-69.)  Ms. Tighe also testified that the Social Studies class that she observed was "academically rigorous," with reading and writing requirements that were "far above" where A.W. was functioning.  (Id. at OAL 5242-43.)

Dr. Gillock similarly observed the in-class resource Social Studies classroom in which A.W. would have been placed, and he opined in his report that the environment was a supportive learning environment but was nevertheless inappropriate for a student like A.W. with auditory processing challenges because of background noise and no properly functioning microphone and speaker.  (Gillock Nov. 2, 2018 Rpt. at OAL 2608-09; Gillock Test. at OAL 5607, 5609-11.)  In addition, Dr. Gillock observed the pullout resource ELA and in-class resource Math classes in which A.W. would have been placed.  (Gillock Nov. 2, 2018 Rpt. at OAL 2508; Gillock Test. at OAL 5613.)  He found the ELA class to be a quiet and supportive learning environment that was conducive to learning but could not assess the "quality or appropriateness of the teaching" in the Math classroom because the students were taking a test for the entire class period.  (Gillock Nov. 2, 2018 Rpt. at OAL 2608.)

**B.  Procedural History and the ALJ's Decision**

Towards the end of A.W.'s fifth-grade year, on May 21, 2018, Parents filed a Due Process Petition, in which they asserted claims under the IDEA and Section 504 of the Rehabilitation Act, and sought compensatory education for the five-year period from November 2012 through December 2017 (A.W.'s kindergarten year through half of his fifth-grade year) as well as tuition reimbursement for the months of fifth grade that A.W. spent at the Cambridge School.  (Pls.' SOF ¶ 1; Due Process Pet'n at OAL 82-85.)  Less than five months later, on October 4, 2018, after Parents had unilaterally placed A.W. at the Cambridge School for his sixth-grade year, Parents filed an Amended Petition, adding claims with respect to the 2018-2019 IEP, which had been

proposed on June 4, 2018, and seeking tuition reimbursement for A.W.'s sixth-grade year at the Cambridge School. (Pls.' SOF ¶ 3; Am. Due Process Pet'n at OAL 283-84.)

The ALJ held twelve days of hearings on Parents' Amended Petition, after which she denied Parents' request for due process and dismissed the Amended Petition, finding that the District had consistently offered and provided a FAPE to A.W. within the least restrictive environment, including in the 2018-2019 IEP.   (ALJ Op. at OAL 3708.)  The ALJ explained her conclusions in a 159-page opinion, in which she exhaustively summarized all of the testimony that the parties had presented at the hearings.  (Id. at OAL 3707-3866.)  That testimony included that of Dr. Michael Lee, the District's Director of Special Education, who testified as a fact witness as well as an "an expert in school psychology, case management, and as an administrator of special education programs" (Def.'s SOF ¶ 3);   Jenna Alesiani, a special education teacher with the District, who was accepted as an expert in the administration of special education instruction, and who taught A.W. in fourth grade (ALJ Op. at OAL 3741); Shelly Craig, a special education teacher with the District who was accepted as an expert in the administration of special education, taught A.W. in fifth grade, and was going to provide A.W. with his pull-out ELA instruction in the sixth grade (id. at OAL 3753, 3756); Christine Hunter, a special education teacher with the District, who was accepted as an expert in the administration of special education instruction, and who taught A.W. in third grade and was going to provide A.W. with his supplemental Wilson Reading instruction in sixth grade (id. at OAL 3761, OAL 3766); Jeanne Tighe, a structured language/dyslexia interventionist, who testified for Parents as an expert in speech language pathology with a specialization in literacy disorders (Pls.' SOF ¶ 59); Dr. James Gillock, who conducted the comprehensive neuropsychological exam of A.W. in 2017, and who testified for

Parents as an expert witness in school psychology and case management (id. ¶ 54; ALJ Op. at OAL 3790); and M.W., A.W.'s mother (ALJ Op. at OAL 3813).

In assessing the witnesses' testimony, the ALJ found that all of the District's employees testified credibly and were familiar with the facts and their respective contacts with A.W. and his mother.  (Id. at OAL 3836.)  She highlighted the persuasiveness of the teachers' detailed testimony concerning the evaluations completed to assess A.W.'s disability, A.W.'s school performance, their teaching methodologies, A.W.'s in-school interactions with his teachers and peers, the modifications and supports that the District utilized to assist A.W., and the assessments that were employed to determine that A.W. had made reasonable and appropriate educational progress in the District.  (Id.)

In contrast, the ALJ had reservations about certain critical testimony from Parents' witnesses.  The ALJ found that M.W. had testified credibly, but also noted that M.W. is not a special education teacher and had no meaningful first-hand knowledge as to what transpired in school.  (Id. at OAL 3835.)  She likewise found that Ms. Tighe had testified credibly regarding the concept of structured literacy but emphasized that that Ms. Tighe is not a special education teacher and never observed A.W. receiving instruction in the District.  (Id.)  The ALJ also observed that Ms. Tighe had critiqued the District's failure to comply with certain recommendations in the New Jersey Dyslexia Handbook, which included a recommendation that sixth grade students receive 80 minutes of language instruction daily (see Tighe Test. at OAL 5204, OAL 5212, OAL 5232), but she discounted that testimony, observing that that New Jersey school districts have "considerable autonomy in making decisions about diagnostic tools and instructional programs" (ALJ Op. at OAL 3835).

The ALJ also responded critically to aspects of Dr. Gillock's testimony.  She specifically found that Dr. Gillock's critique of the educational environment in the District's fifth-grade Math classroom to be "a bit exaggerated."  (Id. at OAL 3835.)  She also found that his testimony "certainly did not support a conclusion that the whole school was not a supportive and nurturing environment" when the evidence was that "the school personnel from the school nurse, his teachers and the [child study team] were supportive of A.W. emotionally and academically."  (Id.)  She further noted that Dr. Gillock did not observe A.W. to be anxious in the Math class, even though his observation took place just one week after A.W. had returned from his one-month absence due to his attendance in the Lindamood-Bell program.  (Id.)  The ALJ similarly did not find persuasive Dr. Gillock's testimony that A.W had an adjustment disorder with anxiety, noting that Dr. Gillock's opinion in that regard was grounded on his unsupported conclusion that A.W. had been mistreated at school and on an oral assessment that had reached a contrary conclusion, i.e., that A.W. did not have anxiety.  (Id. at OAL 3835-36.)  Moreover, the ALJ stated that Dr. Gillock's testimony regarding A.W.'s adjustment disorder was discredited by the testimony of Ms. Alesiani, who did not observe any anxiety or school refusal in fourth grade, before A.W. missed the first month of fifth grade to attend the Lindamood-Bell program.  (Id. at OAL 3836.)  The ALJ added that Parents' decision to allow A.W. to finish Lindamood-Bell, in spite of its conflict with the start of fifth grade, prevented the District from implementing A.W.'s IEP, and noted that missing the first month of fifth grade would cause anxiety in "[a]ny student . . . let alone a child who has a learning disability and has experienced anxiety in the past."  (Id.)  And, finally, the ALJ did not find persuasive Dr. Gillock's testimony that the District's Reading Horizons program was inappropriate instruction for A.W., explaining that Dr. Gillock had no instructional background, was not familiar with the Reading Horizons program, and did not even know that the program was

13

based on Orton-Gillingham principles, having simply done an hour of online research about the program.   (Id.; see also Gillock Test. at OAL 5657 (stating that he has no instructional background).)

Ultimately, after having observed the demeanor of the witnesses,  assessed their credibility and found facts based on the testimony and documentary evidence, the ALJ concluded that "the program offered A.W. by the District constituted FAPE as that term is defined by law," stating that "the evidence reveals that A.W. progressed in his educational program, and that the child study team regularly adjusted his program in an ongoing effort to personalize his instruction and address his educational needs."   (ALJ Op. at OAL 3854; see also id. at OAL 3837-45.)   She also specifically concluded, "[b]ased upon the testimony and documentary evidence, . . . that both the December 18, 2017 IEP . . . and the subsequent June 4, 2018 IEP . . . proposed by the District offered A.W. a free and appropriate public education with the opportunity for meaningful educational benefit and progress appropriate in light of A.W.'s circumstances, within the least restrictive environment."  (Id. at OAL 3854.)

In reaching these conclusions, the ALJ also emphasized that the IDEA's mainstreaming requirement mandates education in the least restrictive environment.  (Id. at OAL 3855 (quoting 20 U.S.C. § 1412(a)(5).)  She observed that "'[t]he least restrictive environment is the one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled.'" (Id. (quoting Carlisle Area Sch. v. Scott P., 62 F.3d 520, 535 (3d Cir. 1995)).  Moreover, she noted that a "placement must be 'as close as possible to the child's home.'"  (Id. (quoting 34 C.F.R. § 300.116(b)(3) (2015)) (additional citations omitted).)  The ALJ found that the District school "is A.W.'s. home school and is the least restrictive environment that will provide A.W. meaningful

education[al] benefit." (Id.) In connection with this analysis, she further specifically found that A.W. was "appropriately placed in a specific education pull-out resource class for ELA" in light of his reading disability and, at the same time, "was appropriately placed in a general education class with in-class supports for Math, Social Studies and Science, areas in which he does not have a disability." (Id.) Finally, she emphasized that it was not her role to compare the private school unilaterally chosen by Parents with the program proposed by the District, and that the appropriate inquiry was only whether the IEP proposed by the District offered a FAPE with the opportunity "for significant leaning and meaningful educational benefit within the [least restrictive environment]." (Id. at OAL 3856.) Having found that the District offered A.W. a FAPE in the least restrictive environment throughout his years in the District, she found that the appropriateness of a placement at the Cambridge School was "irrelevant." (Id.)

With respect to Parents' claim under Section 504 of the Rehabilitation Act, the ALJ stated that because she found "that the District provided A.W. with [a] FAPE in the least restrictive environment," she also found that the District did not violate Section 504. (Id. at OAL 3860.) She specifically rejected Parents' assertion that "the District violated Section 504 by denying A.W. the opportunity to participate in or benefit from public education and denied him access to disability-specific services and auxiliary aids and services required to afford A.W. access to public education." (Id.) In this regard, she reiterated that "the District developed and implemented numerous IEPs on behalf of A.W. which consisted of comprehensive statements of his educational needs and the specially designed instruction and related services to be employed to meet those needs," and that all of the IEPs included "various modifications, supplementary aids and services and assistive technologies that were being provided to A.W." (Id.) She thus concluded that "the

District ha[d] provided appropriate and meaningful services and accommodations to A.W in order to access his education in accordance with Section 504." (Id.)

In the end, based on these findings and conclusions, the ALJ denied Parents' request for due process and dismissed their Amended Petition.   Parents subsequently appealed that decision to this Court.

## II.   LEGAL STANDARD

"When considering an appeal from a state administrative decision under the IDEA, district courts apply a nontraditional standard of review, sometimes referred to as 'modified de novo' review." D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 564 (3d Cir. 2010) (citation omitted). "Under this standard, [we] must give 'due weight' to the findings of the state hearing officer" and must consider the factual findings from the administrative proceedings to be "'prima facie correct.'" Ridley Sch. Dist. v. M.R., 680 F.3d 260, 268 (3d Cir. 2012) (first quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982); then quoting S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 270 (3d Cir. 2003)).   At the same time, we are "authorized to make findings based on the preponderance of the evidence and grant the relief [we] deem[] appropriate." Id. (quoting D.S., 602 F.3d at 564) (citing Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004).   If we do not adhere to the factual findings from the administrative hearings, we must explain why, and we may not "'substitute [our] own notions of sound educational policy for those of local school authorities.'" Id. (quoting State-Operated Sch. Dist. of Newark, 336 F.3d at 270). Moreover, "if a state administrative agency has heard live testimony and has found the testimony of one witness to be more worthy of belief than the contradictory testimony of another witness, that determination is due special weight." Shore Reg'l High Sch., 381 F.3d at 199 (citing State-Operated Sch. Dist. of Newark, 336 F.3d at 270; Carlisle Area Sch. v. Scott P., 62 F.3d 520, 527-

29 (3d Cir. 1995)); see id. at 201 ("[T]he task of evaluating their conflicting opinions lay in the first instance with the ALJ in whose presence they testified.). "Specifically, [we] must accept the state agency's credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion.'" Id. at 199 (emphasis omitted) (quoting Carlisle Area Sch., 62 F.3d at 529).

Finally, as a general matter, the "burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 62 (2005). Subsequently, "the party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." Ridley Sch. Dist., 680 F.3d at 270.

## III. DISCUSSION

Parents  argue that we should reverse the ALJ's decision that the District offered A.W. a FAPE for the 2018-2019 sixth-grade school year and should therefore reverse her resulting conclusion that Parents are not entitled to tuition reimbursement for A.W.'s placement at the Cambridge School for that same school year.[3]  Specifically, Parents contend that the ALJ committed legal error in failing to consider only the IEP that was actually offered for the sixth-grade year and instead considering prior IEPs and "retrospective testimony" as to what the District would have offered to supplement the services actually set forth in the IEP.[4]  They further contend

---

[3] Parents do not challenge the ALJ's decision that the District offered A.W. a FAPE in all prior years, from second through fifth grade, and they object to any consideration of A.W.'s history with the District.  However, we find A.W.'s history with the District to provide important context for the current dispute and to be critical to understanding the ALJ's opinion, which necessarily addressed Parents' challenges to all of A.W.'s education in the District.

[4] "'[R]etrospective testimony' is a term of art originated in [the Second] Circuit in 2012 to refer to testimony about additional services that would have been provided had the parent accepted the school district's proposed placement." Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ., 760 F.3d

that, based on the evidence in the record, the ALJ should have found that the 2018-2019 IEP itself did not offer a FAPE and, thus, Parents are entitled to tuition reimbursement for the sixth-grade school year.  Finally, they contend that the ALJ erred in denying them relief under Section 504 of the Rehabilitation Act.  The District argues in its own Motion that we should affirm the ALJ's decision in all material respects, dismiss Parents' appeal, and enter judgment in the District's favor.

### A.   Asserted Legal Error in Evaluating the 2018-2019 IEP

As noted above, Parents first argue that the ALJ committed legal error when evaluating whether the 2018-2019 IEP offered a FAPE because she failed to consider only the terms of the IEP itself and what it actually offered, and she instead entertained "the District's *post hoc* suggestions of services and support it might have provided, if [A.W.] had been enrolled in the District's program" and "generalize[d] about the program offered based on programs offered in the past."  (Pls.' Mem. in Supp. of Mot. for J. on the Admin. R. ("Pls.' Mem.") at 11-12.) Specifically, in Parents' view, the ALJ improperly based her conclusion that the 2018-2019 IEP offered a FAPE on the District's testimony that A.W. would have been placed in an in-class resource program for Science and Social Studies, and would have been offered one-to-one Wilson instruction.[5]  Parents argue that "[b]y permitting the District to testify to these major and minor alterations to the IEP that were never presented to A.W.'s parents, the ALJ failed to respect the

---

211, 220 n.6 (2d Cir. 2014) (emphasis omitted) (citing <u>R.E. v. N.Y.C. Dep't of Educ.</u>, 694 F.3d 167, 185 (2d Cir. 2012)).

[5] Parents also argue that the ALJ improperly based her conclusion that the IEP offered a FAPE on the District's testimony that A.W. would have received Wilson instruction twice weekly, asserting that the IEP only specified that such instruction would occur twice per six day cycle. However, contrary to Parents' assertion, the proposed IEP clearly states that Wilson instruction would be offered twice weekly, and Parents' counsel even acknowledged this fact during the ALJ's hearings.  (<u>See</u> 2018-2019 IEP at OAL 1783; Lee Test. at OAL 4348.)  Thus, the ALJ could not have erred in relying on accurate information that the IEP offered Wilson instruction twice weekly.

[reality that] parents can only make a decision based on what the District has told them [at] the time that they make the decision to unilaterally place their child."  (Pls.' Mem. at 18; see also id. (arguing that the ALJ analyzed "not what . . . Parents had reason to believe that the District was offering, but rather [an] improved program that the District decided to claim it would have offered later").)

The United States Court of Appeals for the Third Circuit has stated that the "adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date." Fuhrmann v. E. Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d Cir. 1993); see also R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 187 (2d Cir. 2012) ("The appropriate inquiry is into the nature of the program actually offered in the written plan.").  Thus, "in determining whether an IEP was appropriate, the focus should be on the IEP actually offered and not on one that the school board could have provided if it had been so inclined." Lascari v. Bd. of Educ. of Ramapo Indian Hills Reg'l High Sch. Dist., 560 A.2d 1180, 1189 (N.J. 1989); see also Norristown Area Sch. Dist. v. Frank, Civ. A. No. 13-5612, 2014 WL 11370484, at *10 (E.D. Pa. June 18, 2014) (stating that, in determining whether district provided a FAPE, we "restrict our analysis to the IEP itself rather than predicting what services the District would have actually provided to [the child]" (citing Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 762 (3d Cir. 1995))), aff'd sub nom. Norristown Area Sch. Dist. v. F.C., 636 F. App'x 857 (3d Cir. 2016).  Moreover, "a deficient IEP may not be effectively rehabilitated or amended after the fact through testimony regarding services that do not appear in the IEP." R.E., 694 F.3d at 185.  Accordingly, a court assessing the adequacy of an IEP may not consider "testimony that materially alters the written plan." Id. at 186 (citing Bayonne Bd. of Educ., 602 F.3d at 564-65).  It may, however, consider testimony that "explains or justifies the services listed in the IEP." Id. (citing Bayonne Bd. of Educ., 602 F.3d at 564-65); see also

id. ("For example, if an IEP states that a specific teaching method will be used to instruct a student, the school district may introduce testimony at the subsequent hearing to describe that teaching method and explain why it was appropriate for the student."). We may also "use evidence acquired subsequently to the creation of an IEP . . . to evaluate the reasonableness of the school district's decisions at the time that they were made." Bayonne Bd. of Educ., 602 F.3d at 564–65 (citing Wilson Sch. Dist., 70 F.3d at 762).

Parents contend that the ALJ violated these essential principles when she concluded that the 2018-2019 IEP offered a FAPE, because she relied on testimony that the District would offer the services detailed above, when the District had not included those services in the IEP. However, at no point in her opinion does the ALJ state that her conclusion that the 2018-2019 IEP offered a FAPE was grounded on findings that the 2018-2019 IEP offered an in-class resource program in Social Studies and Science, or that the Wilson instruction would be one-to-one. While the ALJ made a factual finding that A.W.'s experts were told that A.W. would be in an in-class resource classroom for Science and Social Studies (and they were shown such a Social Studies classroom when they came to the District in November of 2018), she also explicitly found that the IEP recommended a special education in-class resource placement only for Math, not for Social Studies and Science. (ALJ Op. at OAL 3851.) And although A.W. was not offered an in-class resource program for Social Studies and Science, the ALJ correctly found that "[v]arious modifications and supplementary aids and services were set forth for . . . the . . . general education setting[]," which included the Social Studies and Science general education classes, because the 2018-2019 IEP provided that A.W.'s teachers in all of his classes would provide special modifications to A.W.,

including, e.g., test modifications and study guides.[6]  (ALJ Op. at OAL 3851 (citing 2018-2019 IEP at OAL 1782)); 2018-2019 IEP at OAL 1782 (providing for modifications in both general and special education classrooms, including test modification, study guides, homework assignment book checks, assistance with vocabulary modified and be provided study guides); see also Lee Test. at OAL 4356-57 (stating that general education teacher would provide specified modifications in sixth grade general education setting).)  Likewise, while the ALJ found that the District had decided to provide A.W. with one-to-one Wilson instruction and that it believed that it had offered such instruction (see ALJ Op. at OAL 3850), there is simply no basis in this record on which we can conclude that her determination that the 2018-2019 IEP offered A.W. a FAPE

---

[6] Parents nevertheless argue that the ALJ erroneously found—and based her conclusion that A.W. was offered a FAPE for sixth grade on a finding—that A.W. would have had in-class support programs in Science and Social Studies, because she stated in her legal analysis that A.W. "was appropriately placed in a general education class with in-class supports for Math, Social Studies and Science, areas in which he does not have a disability."  (ALJ Op. at OAL 3855.)  However, we cannot conclude that the ALJ's reference to "in-class supports" in this context refers only to in-class resource programs, as that phrase can include the other "modifications and supplementary aids and services" that the ALJ correctly found were specified for the sixth grade general education settings.  (ALJ Op. at OAL 3851; 2018-2019 IEP at OAL 1782; Lee Test. at OAL 4356-57.)  Moreover, the ALJ made her statement that A.W. was "placed in a general education class with in-class supports for Math, Social Studies and Science" in connection with her analysis of whether the District had consistently offered a FAPE in the least restrictive environment and, thus, we understand that the purpose of the statement was to highlight that the District properly placed A.W. in general education classes with non-disabled students, not to delineate the nature of the supports provided in those classes.  And, finally, we reiterate that the ALJ made clear that she fully understood that the 2018-2019 IEP did not offer in-class resource placements for Social Studies and Science.  (See ALJ Op. at OAL 3851.)  For all of these reasons, we are unpersuaded that the statement on which Parents rely demonstrates that the ALJ erroneously based her conclusion that the 2018-2019 IEP offered A.W. a FAPE on a belief that the District had offered to provide A.W. an in-class resource program in his sixth grade Science and Social Studies classes.

was premised on a finding that Wilson instruction would necessarily be one-to-one instead of in a small-group setting.[7]

For all of these reasons, we cannot conclude that the ALJ committed legal error by basing her conclusion that the 2018-2019 IEP offered a FAPE on a determination that the District would offer services that were not included in the IEP.  We therefore reject Parents' argument that the ALJ's decision should be reversed on that basis.

## B. Asserted Factual Error in Evaluating the 2018-2019 IEP & Declining Tuition Reimbursement

In the alternative, Parents argue that, if the ALJ considered only the program that was set forth in the 2018-2019 IEP for A.W.'s sixth-grade school year, she necessarily erred in concluding that the program offered A.W. a FAPE.  Parents also contend that the record establishes that the private placement at the Cambridge School was proper and that they should therefore be reimbursed for the cost of A.W.'s sixth-grade year there.

The District argues in its own Motion that the ALJ properly concluded that the District offered A.W. a FAPE in the least restrictive environment and that, in any event, Parents have failed to establish a record on which to conclude that the Cambridge School was an appropriate placement in the least restrictive environment.  The District therefore asks that we declare, as the ALJ did, that Parents are not entitled to reimbursement for the cost of educating A.W. at the Cambridge School.

---

[7] Notably, the Wilson instruction at the Cambridge School was in a small-group setting, not one-to-one, and Parents do not question the appropriateness of the instruction at the Cambridge School.  (See ALJ Op. at OAL 3850 (stating that Dr. Lee testified that "the District knew A.W. was not getting one to one instruction at the Cambridge [S]chool"); Tighe Rpt. at OAL 2702 ("At Cambridge School, [A.W.] participates in daily direct Wilson Reading instruction in a group setting.").)  Thus, we do not understand Parents to be arguing that one-to-one Wilson instruction is a necessary component of A.W.'s FAPE.

1.   The IDEA's Requirements

The IDEA requires states that accept federal funding to make a FAPE available to all eligible children with disabilities.  Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dis. RE-1, 137 S. Ct. 988, 993 (2017) (citations omitted).  The statute defines a FAPE to include both "'special education,'" i.e., "'specially designed instruction . . . to meet the unique needs of [the] child,'" and "'related services,'" i.e., support services that are "'required to assist [the] child . . . to benefit from' that instruction."  Id. at 994 (alterations in original) (quoting 20 U.S.C. §§ 1401(9), (26), (29)).  To meet its duty to provide a FAPE, a school district must "design[] and administer[] a program of individualized instruction for each special education student," which is memorialized in an IEP.  Bayonne Bd. of Educ., 602 F.3d at 557 (citing 20 U.S.C. §§ 1412(a)(4), 1414(d)).  The IEP sets forth "'a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services.'"  Id. (quoting Holmes v. Millcreek Twp. Sch. Dist., 205 F.3d 583, 589 (3d Cir. 2000)).

An "IEP must provide the student with a basic floor of opportunity," but "it need not necessarily provide the optimal level of services that parents might desire for their child."  Id. (citation and internal quotations omitted).  Indeed, "[w]hatever Congress meant by an 'appropriate' education, it is clear that it did not mean a potential-maximizing education."  Rowley, 458 U.S. at 197 n.21.  Rather, the IEP need only be "reasonably calculated to enable the child to make progress appropriate in light of his circumstances."  Endrew F., 137 S. Ct. at 1001; see also Rowley, 458 U.S. at 206-07 (stating that IEP must be "reasonably calculated to enable the child to receive educational benefits").  Furthermore, "'[t]he issue of whether an IEP is appropriate is a question

of fact.'" <u>Bayonne Bd. of Educ.</u>, 602 F.3d at 564 (quoting <u>State-Operated Sch. Dist. of Newark</u>, 336 F.3d at 271).

The IDEA "does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a [FAPE] available to the child and the parents elected to place the child in such private school or facility." 20 U.S.C. § 1412(a)(10)(C)(i).  On the other hand, where parents unilaterally enroll their child in a private school, "a court or a hearing officer may require the [District] to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a [FAPE] available to the child in a timely manner prior to that enrollment." <u>Id.</u> § 1412(a)(10)(C)(ii).  Before ordering reimbursement, the court must conclude "both that the public placement violated IDEA and that the private school placement was proper under the Act." <u>Florence Cnty. Sch. Dist. Four v. Carter</u>, 510 U.S. 7, 15 (1993).  "A private placement is 'proper' if it (1) is 'appropriate,' i.e., it provides 'significant learning' and confers 'meaningful benefit,' and (2) is provided in the least restrictive educational environment." <u>Lauren W. ex rel. Jean W. v. DeFlaminis</u>, 480 F.3d 259, 276 (3d Cir. 2007) (quotation omitted).

2.  <u>FAPE Analysis</u>

Parents argue that the ALJ erred in finding that the 2018-2019 IEP offered a FAPE because the IEP removed A.W. from the in-class resource program in his Science and Social Studies classes for the first time in five years, it decreased A.W.'s literacy instruction and frequency of reading intervention, and it did not provide him with specialized writing instruction and speech language therapy.  As noted above, the issue of whether an IEP is appropriate is a question of fact.  <u>State-Operated Sch. Dist. of Newark</u>, 336 F.3d at 271 (citation omitted).  Thus, we must consider the

24

ALJ's determination that the IEP was appropriate to be prima facie correct.  Id. at 270 (citing MM v. Sch. Dist. of Greenville Cnty., 303 F.3d 523, 531 (4th Cir. 2002)).

### a. The ALJ's Determination

In concluding that the 2018-2019 IEP offered a FAPE, the ALJ relied on the testimony of the District's witnesses, who she found to have provided credible and detailed testimony based on their familiarity with A.W.'s schooling.  (ALJ Op. at OAL 3836.)  She found "especially persuasive" the detailed testimony from A.W.'s third-, fourth-, and fifth-grade special educations teachers who "personally worked with and observed A.W. on a daily basis" and were "educational experts in delivering special instruction to children with disabilities."  (Id.)  This included the testimony of A.W.'s fifth-grade special education teacher, Ms. Craig, who testified about her teaching methods in the ELA pull-out resource class that A.W. would have attended in sixth grade.  (See Craig Test. at OAL 4666-82.)   It also included the testimony of Ms.  Hunter, who taught A.W. in his pullout resource ELA class in third grade (Hunter Test. at OAL 4762), was a certified Wilson Reading teacher (id. at OAL 4755), "had a very great relationship" with A.W. (id. at OAL 4811), and was going to provide A.W. with his supplemental Wilson Reading instruction in sixth grade (id. at OAL 4834-36).  The ALJ also specifically found that the District's "personnel [had] testified convincingly as to A.W.'s progress" in the District.[8]  (ALJ Op. at OAL 3855; see also id. at OAL 3854 ("[T]he evidence reveals that A.W. progressed in his educational program.").)  This

---

[8] This testimony included the testimony of A.W.'s third-, fourth-, and fifth-grade teachers. (See Hunter Test. at OAL 4795-96 (testifying that that A.W. "performed very well" in her third grade class, "mastered [his] goals," and "really [made] progress"); Alesiani Test. at OAL 4509, 4533-34 (testifying that, in fourth grade, A.W. made progress and "performed with great success," mastering all of his goals in his IEP and growing "not only academically, but as just a general learner and building . . . confidence"); Craig Test. at OAL 4740-41 (testifying that A.W. made progress in reading during his time in the District's fifth grade).)

credited testimony concerning progress included the testimony of Dr. Lee, the District's Director of Special Education, that A.W. had consistently made progress in the District prior to his unilateral placement at the Cambridge School and that the progress had been meaningful.[9]   (Lee Test. at OAL 3989, 4187.)

The ALJ also included in her factual findings that Dr. Lee testified that the programs that the District had offered to A.W. largely satisfied all of Dr. Gillock's educational recommendations in his January 2018 report.[10]   (ALJ Op. at OAL 3848-50.)   Specifically, she noted that Dr. Lee testified that, as Dr. Gillock recommended, the District's programs provided for (1) instruction that uses "multiple, intensive, and sequential Orton Gillingham based multi-sensory approaches to remediating reading, spelling, [and] written expression disorders" (Lee Test. at OAL 4174-75); (2)

---

[9] Parents argue that the ALJ erred in "explicitly" concluding that half the progress of A.W.'s peers over three years of elementary school was sufficient.   (Pls.' Br. at 35.)   However, the ALJ made no such explicit finding.   While Dr. Lee testified on cross-examination that A.W.'s Developmental Reading Assessment ("DRA") scores reflected that A.W. had made one and a half years of progress between the start of second grade and the end of fourth grade, it is misleading to suggest that this one measure of A.W.'s progress is the only relevant measure.   (Lee Test. at OAL 4220-22; see, e.g., Pls.' SOF ¶ 111 (referring to other measures of reading progress).)   Moreover, Ms. Craig, A.W.'s fifth-grade teacher, testified that A.W.'s DRA scores showed progress and that she did not agree that he was "falling below his peers."   (Craig Test. at OAL 4740-41.)   She also specifically resisted the efforts of Parents' counsel to compare A.W.'s scores to others when he is an "individual with a separate IEP with totally different goals than someone else."   (Id. at OAL 4741.)   Accordingly, contrary to Parents' argument, we cannot find that the ALJ's conclusion that "the evidence reveals that A.W. progressed in his educational program" was grounded on an "explicit" conclusion that half the progress of A.W.'s peers was sufficient progress.   (ALJ Op. at OAL 3854.)

[10] The ALJ found that Dr. Lee was credible.   (ALJ Op. at OAL 3836 ("The District employees all testified credibly.").)   Parents argue that this finding was not well-reasoned or justified, but they do not point to any "non-testimonial, extrinsic evidence in the record" that would cause us to conclude that the ALJ should have instead found him incredible.   Shore Reg'l High Sch., 381 F.3d at 199 (quotation omitted).   Rather, to the extent that Parents identify factual errors in Dr. Lee's testimony, we find those errors to be inconsequential to the ALJ's overall credibility determination that Dr. Lee, like the other District employees, "testified credibly and [was] familiar with the [pertinent] facts."   (ALJ Op. at OAL 3836.)

ESY offerings (id. at OAL 4176); (3) a student-to-staff ratio of no more than 8 students to one teacher in the resource room, including in the sixth-grade pullout replacement room, in which A.W. would have been the fifth student (id. at OAL 4176-77); (4) access to a counselor and/or school psychologist trained in cognitive behavioral therapy techniques on an as-needed basis (id. at OAL 4177-78); (5) staff and administration who were willing to implement the kinds and types of approaches and methodologies that Dr. Gillock recommended (id. at OAL 4178); and (6) large classrooms outfitted with an FM sound field system (id. at OAL 4178-79).  (ALJ Op. at OAL 3848-50.)  Based on this testimony, the ALJ found as a fact that "[a]ll the recommendations contained in Dr. Gillock's report were already being implemented by the . . . District."  (Id. at OAL 3850.)

Ultimately, the ALJ found as a fact that the June 4, 2018 IEP offered a FAPE "with the opportunity for meaningful educational benefit and progress appropriate in light of A.W.'s circumstances, within the least restrictive environment." (ALJ Op. at OAL 3854.)  She based this determination on the testimony and documentary evidence that she had received over the course of the twelve days of hearings.  (Id. at OAL 3854; see also id. at OAL 3708 (listing the ALJ's hearing dates).)  She observed, relying on Ms. Tighe's testimony, that "[t]here are no hard and fast rules as to how services [for a FAPE] can be delivered.  It can be in the classroom, pullout resource, interventional or supplementary."  (Id. at OAL 3851.)  In addition, she highlighted that the sixth-grade IEP proposed providing A.W. with "a multi-sensory, direct instruction decoding program two times per week for fifty minutes in addition to his pull-out resource reading class," and further highlighted that Ms. Tighe had testified that the Wilson instruction that the District would provide to A.W. was "perfectly competent Wilson instruction."  (Id.)  The ALJ's finding that the 2018-2019 IEP offered a FAPE was also fully consistent with Dr. Lee's testimony that the sixth-grade

27

IEP offered a reasonable appropriate program in the least restrictive environment.  (Lee Test. at OAL 4165.)

### b.  Asserted Deficiencies in the 2018-2019 IEP

#### i.  In-Class Resource Programs in Science and Social Studies

Parents argue that the IEP did not offer a FAPE because, inter alia, it did not offer an in-class resource programs in Science and Social Studies.  In this regard, they argue that "[b]oth Dr. Gillock and Ms. Tighe testified that they had enormous concerns with A.W.'s placement in the sixth grade Social Studies and Science classes at all, let alone without the support of [a] special education teacher."  (Pls.' Mem. at 31.)  In this regard, Ms. Tighe wrote in her report that A.W.'s placement in a general education Social Studies class "without any individualized support form [sic] the special education teacher is exceptionally out of touch with his learning needs," and Dr. Gillock expressed concern about the auditory challenges of a large classroom with or without a special education teacher.  (Tighe Rpt. at OAL 2702 (emphasis omitted); Gillock Test. at OAL 5611.)

However, as previously explained, the ALJ found Parents' two expert witnesses, Ms. Tighe and Dr. Gillock, to be incredible in critical respects, which ultimately undermines their opinions regarding the appropriateness of the education that the District offered.  (See ALJ Op. at OAL 3835-36.)  Most significantly, the ALJ discounted Ms. Tighe's testimony regarding the education that the District offered to A.W. because, among other things, she was not a special education teacher and had never observed A.W. receiving instruction in the District.  (Id. at OAL 3835.) Moreover, while the ALJ did not specifically find Dr. Gillock to be incredible insofar as he testified regarding the auditory challenges presented by the sixth-grade Social Studies classroom that he visited, Dr. Gillock's recommendation for dealing with those auditory challenges was to outfit

classrooms with an FM sound field system, which the ALJ noted the District already provided. (See Gillock Test. at OAL 5784-85; ALJ Op. at OAL 3850; see also 2018-2019 IEP at OAL 1778 (observing that A.W. "requires an FM system in class to address his Central Auditory Processing Disorder").) Furthermore, we must accept the ALJ's credibility determinations concerning Ms. Tighe and Dr. Gillock unless Parents establish that "the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." Shore Reg'l High Sch., 381 F.3d at 199 (quotation omitted). Here, Parents have not clearly identified non-testimonial, extrinsic evidence in the record from which we could conclude that the ALJ's credibility determinations were incorrect.[11] Accordingly, we accept those credibility determinations.

Apparently recognizing the limited persuasiveness of Ms. Tighe's and Dr. Gillock's testimony and opinions in light of the ALJ's credibility determinations, Parents argue that the "[m]ost important[]" evidence in this regard is that "District witnesses admitted that [A.W.'s proposed sixth grade Social Studies and Science] classes were not appropriate placements for A.W. without In-Class Support." (Pls.' Mem. at 32.) However, this argument mischaracterizes the

---

[11] Parents do argue that there is documentary evidence that contradicts the ALJ's determination that Dr. Gillock was incredible insofar as he testified that A.W. demonstrated adjustment disorder with anxiety. (Pls.' Mem. in Opp. to Def.'s Mot. at 17.) Specifically, they point out that the ALJ discredited this aspect of Dr. Gillock's testimony based, in part, on her factual finding that A.W.'s school refusal first manifested itself when A.W. returned to the District after a one-month absence due to his participation in the Lindamood Bell program. (ALJ Op. at OAL 3836.) Parents argue that this finding was clearly erroneous, pointing specifically to hearing testimony concerning a notation in A.W.'s educational records that A.W. refused to go to class when he arrived at the District at the start of fifth grade, on September 12, 2017. (Pls.' Mem in Opp. to Def.'s Mot. at 18 (citing M.W. Test. at OAL 5946 (reading from Hrg. Ex. J-113).) However, we are unable able to locate the educational record to which this testimony refers (Ex. J-113) because the filed administrative record only appears to include exhibits numbered up to J-110. But more importantly, we cannot find this single instance of A.W. refusing to go to class after more than a month at the Lindamood Bell program, albeit before his one-month absence from the District's fifth grade, or any other non-testimonial, extrinsic evidence in the administrative record, to mandate that the ALJ erred in discrediting Dr. Gillock's testimony as to his diagnosis of adjustment disorder with anxiety.

testimony of A.W.'s fourth- and fifth-grade special education teachers.  Ms. Alesiani, A.W.'s fourth-grade teacher, testified only that the last time that she observed A.W., which was in fourth grade, she thought that in-class supports in Math, Social Studies and Science were appropriate, a fact that is not in dispute.  (Alesiani Test. at OAL 4447, 4599.)  Critically, Ms. Alesiani did not address the appropriateness of such support—or particularly in-class resource programs—in sixth grade.  Similarly, Ms. Craig, A.W.'s fifth-grade teacher, testified that she "absolutely" would have had concerns if A.W. had not had his in-class resource programs in his fifth-grade inclusion classes (Craig Test. at OAL 4708), but she also testified that sixth grade is "a whole new ball game," where students are more independent and, indeed, it was her job as a fifth-grade teacher to prepare her students for those changes in sixth grade (id. at OAL 4738-39).  Thus, we do not find the testimony of Ms. Craig and Ms. Alesiani to support Parents' argument that the ALJ erred in failing to find that the District did not offer A.W. a FAPE in sixth grade because it did not offer in-class resource programs in Science and Social Studies.

Moreover, we find particularly noteworthy that Parents do not address the District's obligation to provide A.W. a FAPE in the least restrictive environment.  Essentially ignoring the benefits of a placement with typically-developing, non-disabled students, Parents vigorously advocate that they be reimbursed for placing A.W. in the Cambridge School, where all of the students have learning disabilities.  (Def.'s SOF ¶ 102.)  Indeed, when Parents point out that Ms. Tighe and Dr. Gillock had "enormous concerns with A.W.'s placement in the sixth grade Social Studies and Science classes at all" (Pls.' Mem. at 31), they do not account for the IDEA's mainstreaming requirement, which states that "[t]o the maximum extent appropriate, children with disabilities [are to be] educated with children who are not disabled," 20 U.S.C. § 1412(a)(5).  In this case, the ALJ observed that Ms. Tighe conceded that the District could provide an appropriate

program for A.W. using the 2018-2019 IEP as a baseline.  (ALJ Op. at OAL 3851; Tighe Test. at OAL 5234-35.)  Although Ms. Tighe also took the position that the 2018-2019 IEP as written did not provide A.W. a FAPE (Tighe Test. at OAL 5240), the ALJ properly took into account the accepted benefits of mainstreaming when she dismissed A.W.'s challenge to the District's programming, which included placement in certain general education classes with his typically developing peers (ALJ Op. at OAL 3855-56).

For all of these reasons—the ALJ's discrediting of critical aspects of the testimony of Ms. Tighe and Dr. Gillock, her crediting of the District witnesses whose testimony did not support the conclusion that A.W. needed in-class resource placements in his sixth grade Science and Social Studies, and the IDEA's mainstreaming requirement—we cannot conclude that the preponderance of the evidence supports a conclusion that the 2018-2019 IEP did not offer a FAPE because it proposed placing A.W. in general education Social Studies and Science classes without in-class resource programs.

ii.   Amount of Literacy Instruction and Reading Intervention

Parents next argue that the ALJ erred in finding that the District offered A.W. a FAPE in the least restrictive environment because it decreased A.W.'s literacy instruction and frequency of reading intervention from the year before, when Ms. Tighe, Dr. Gillock, and the New Jersey Dyslexia Handbook recommended otherwise; Dr. Gillock opined that A.W. had not progressed sufficiently in reading in prior years in spite of being provided more instructional time and intervention; and both Ms. Tighe and Dr. Gillock thought that A.W. had greater potential for growth than he was achieving.  (See Tighe Rpt. at OAL 2698, OAL 2701 (opining that the 2018-2019 IEP "does not provide appropriate programming to meet A.W.'s language and literacy needs" and stating that the Dyslexia Handbook recommends more minutes of instruction); Gillock Nov.

31

2, 2018 Rpt. at OAL 2629 (opining that test data "demonstrate[s] a lack of sufficient educational progress" in reading from second to mid-fifth grades and that 2018-2019 IEP "fails to provide an adequate amount of specialized multi-sensory direct reading instruction"); Pls.' SOF ¶¶ 112(a)-(d) (addressing views of Ms. Tighe and Dr. Gillock regarding A.W.'s potential for growth).) However, as noted above, the ALJ rightfully concluded that the District was not bound by the guidelines in the Dyslexia Handbook, stating that districts have "considerable autonomy in making decisions about diagnostic tools and instructional programs."   (ALJ Op. at OAL 3835.) Furthermore, Dr. Lee, who the ALJ found credible, testified that the focus on minutes of instruction is often misguided as one must look closely at how those minutes are spent, the quality of instruction, what is offered in addition to those minutes of instruction, what the school has the capacity to offer to a student if more instruction is needed, and the school's ability to offer instruction near to a student's home and in the least restrictive environment.   (See Lee Test. at OAL 4165-69.)  Dr. Lee also explained that the proposed decrease in ELA instruction in sixth grade was due to the District's Board-approved curriculum, which anticipates a natural progression that, over time, both decreases the time spent in ELA classes and increases the time spent in Science and Social Studies.  (Id. at OAL 4126-27.)   Thus, giving due weight to the ALJ's findings, we cannot find that the mere fact that the 2018-2019 IEP reduced A.W.'s minutes of instruction over the year before dictated that the 2018-2019 IEP did not offer a FAPE.

We also reject Parents' assertion that the preponderance of the evidence necessarily supports a conclusion that the progress that A.W had made prior to his unilateral placement at the Cambridge School was not sufficient and thus dictated that any reduction in services was inappropriate.  As stated above, an IEP need only be "reasonably calculated to enable the child to make progress appropriate in light of his circumstances" Endrew F., 137 S. Ct. at 1002, and need

not be "potential-maximizing," Rowley, 458 U.S. at 197 n.21.  Here, the ALJ reasonably relied on the testimony of credible District witnesses to find that A.W. had made progress in the District and that the IEPs had given him the opportunity for "meaningful educational benefits."  (ALJ Op. at OAL 3854-56; see supra note 8.)  We are required to consider that finding to be prima facie correct, and Parents have not presented evidence from which we could confidently conclude, by a preponderance of the evidence on modified de novo review, that the finding was erroneous. Accordingly, we will not find that the 2018-2019 IEP did not offer a FAPE based on a conclusion that A.W.'s prior progress in the District had been insufficient.

For the above reasons, we conclude that Parents have failed to establish that a preponderance of the record evidence demonstrates that the amount of reading and literacy instruction in the 2018-2019 IEP necessarily deprived A.W. of a FAPE and conclude, to the contrary that the evidence supports a conclusion that the reading and literacy instruction was appropriate to meet A.W.'s educational needs.  We therefore reject Parents' argument that, because of the decreased amount of reading and literacy instructions, the ALJ erred in finding that the District offered A.W. a FAPE for the 2018-2019 sixth-grade school year.

### iii.   Specialized Writing Instruction and Speech Language Therapy

Finally, Parents argue that the ALJ erred in finding that the 2018-2019 IEP offered a FAPE because it did not it provide A.W. with specialized writing instruction and did not either provide for speech language therapy or, at a minimum, propose an evaluation to identify any potential need for such therapy.

With regard to writing instruction, Parents point out that both Ms. Tighe and Dr. Gillock testified concerning the benefits of "bottom-up" writing instruction, which is instruction that starts with a small piece of language and builds.  (Gillock Test. at OAL 5589; Tighe Test. at OAL 5166-

5167; Gillock Jan. 4, 2018 Rpt. at OAL 2584.)  The District uses New Jersey Instructional Coach in the sixth grade, which, according to Ms. Tighe, provides top-down writing instruction.  (Craig Test. at OAL 4667; Tighe Test. at OAL 5166.)  In this instruction, students are shown a model finished product and are asked to make their own writing look like the model.  (Craig Test. at OAL 4673-74; Tight Test. at OAL 5165-66; see also id. at OAL 5168-69 (stating that the District's sixth-grade writing instruction did not "focus on building basic correct complete varied sentences," but rather focused on the "craft" of writing and how to make writing "more interesting and more literate").)   In Ms. Tighe's view, bottom-up instruction is more productive than top-down instruction.  (Tighe Test. at OAL 5167.)

However, on modified de novo review, we cannot find that a preponderance of the evidence that has been deemed credible by the ALJ demands a conclusion that the 2018-2019 IEP did not provide for a FAPE because it failed to specifically address the provision of bottom-up writing instruction.  While the writing instruction that the District offered may not have been bottom-up instruction, Ms. Craig, the special education expert and teacher who was to be in charge of A.W.'s writing instruction in his sixth-grade pull-out ELA class, testified knowledgeably and at some length regarding the targeted writing instruction in that classroom, and made clear that she adjusts the teaching to address students' particular abilities and educational needs.  (See generally Craig Test. at OAL 4666-82; see also id. at OAL 4668 ("[T]here are instances where I need to drive my instruction with what my children need" to ensure, inter alia, that "they don't get frustrated.")  We will credit Ms. Craig regarding the effectiveness of this writing instruction, as well as Mr. Lee's testimony that it was part of an appropriate program for A.W., and will not "substitute [our] own notions of sound educational policy for those of local school authorities."  Ridley Sch. Dist., 680 F.3d at 268 (quotation omitted).  Moreover, we note that although Ms. Tighe testified that bottom-

34

up instruction would be "far more productive" than top-down instruction, she also testified that there is "place for [top-down] instruction" and that she did not "have [a] problem with [it] overall." (Tighe Test. at OAL 5166-67.)   It is also worth observing that even Dr. Gillock conceded that the data supported a conclusion that A.W.'s instructional program in written expression in the District from second to mid-fifth grade had been appropriate, and he found that that the data was actually inconclusive as to whether A.W. made appropriate written expression progress at the Cambridge School, where bottom-up instruction was employed.  (Gillock Nov. 12, 2018 Rpt. at OAL 2625; Gillock Test. at OAL 5667-68.)

With respect to speech therapy, Parents correctly note that the 2018-2019 IEP did not offer speech language therapy.  They take the position that the IEP did not offer a FAPE in the absence of some recognition of A.W.'s speech therapy needs because Ms. Tighe testified that A.W. had an expressive language deficiency for which he was receiving speech therapy at the Cambridge School (Tighe Test. at OAL 5251-52, OAL 5127), and because, in Ms. Tighe's view, the District should not have discontinued A.W.'s speech language therapy in fourth grade without doing further evaluation (id. at OAL 5285-86).  However, Dr. Lee specifically testified that the District had previously concluded that A.W. had mastered his goals in speech and language therapy, and we accept that testimony and his expert opinion regarding A.W.'s speech therapy needs.  (Lee Test. at OAL 4106-07.)  Consequently, we cannot find, by a preponderance of the evidence, that the lack of speech therapy in the 2018-2019 IEP was a material omission.

For the above reasons, we conclude that the record contains evidence that supports a reasonable conclusion that the District's writing program offered in the 2018-2019 IEP provided A.W. with the opportunity for meaningful educational benefit in light of A.W.'s circumstances. and a preponderance of the credible evidence does not support a contrary conclusion.  See Endrew

35

F., 137 S. Ct. at 1002.  We also conclude that the District both was aware of its obligation to address A.W.'s speech and language needs and had addressed those needs in accordance with those obligations.  We therefore reject Parents' argument that the ALJ erred in finding that the 2018-2019 IEP offered A.W. a FAPE because it did not offer him bottom-up writing instruction and/or provide for either speech language therapy or additional testing for an expressive language disorder.

In sum, with respect to all of Parents' specific complaints about the program the District offered to A.W. for the 2018-2019 school year, we reiterate that the IDEA only requires the District to provide an appropriate education, and "[w]hatever Congress meant by an 'appropriate' education, . . . it did not mean a potential-maximizing education." Rowley, 458 U.S. at 197 n.21. Moreover, the "IDEA does not require a FAPE to be a perfect or ideal education." Jalen Z. v. Sch. Dist. of Phila., 104 F. Supp. 3d 660, 669 (E.D. Pa. 2015).  Rather, a school is only required to "supply an education that provides 'significant learning' and 'meaningful benefit' to the child." Ridley Sch. Dist., 680 F.3d at 269 (citation omitted).  Here, we are confident based on our own careful review of the record evidence on modified de novo review that the ALJ properly concluded that the education that the District offered in the 2018-2019 IEP was reasonably calculated to enable A.W. to receive educational benefits.   We therefore reject Parents' argument that the ALJ erred in finding that the 2018-2019 IEP offered a FAPE in the least restrictive environment, and we affirm the ALJ's decision in that regard.  Furthermore, because we reach this conclusion, and conclude that Parents are not entitled to reimbursement for A.W.'s sixth-grade year on this basis, we need not address the District's alternative argument that reimbursement should be denied because Parents failed to establish a record on which to conclude that the Cambridge School was an appropriate alternative placement.

### C.     Section 504

In their Motion, Parents also seek an order reversing the ALJ and entering judgment in their favor on their claim under Section 504 of the Rehabilitation Act.  "A plaintiff claiming deprivation of a FAPE frequently seeks relief under [both] the IDEA [and] Section 504. . . ." M.M. v. Sch. Dist. of Phila., 142 F. Supp. 3d 396, 400 2 (E.D. Pa. 2015).  While the "IDEA provides an affirmative duty to provide education, . . . the Rehabilitation Act prohibits discrimination against the disabled." EK v. Warwick Sch. Dist., Civ. A. No. 09-4205, 2014 WL 737328, at *15 (E.D. Pa. Feb. 26, 2014) (citation omitted).  Specifically, § 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  "[Section] 504's 'negative prohibition' is similar to the IDEA's 'affirmative duty' and . . . requires schools that receive federal financial assistance to 'provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction.'" D.K. v. Abington Sch. Dist., 696 F.3d 233, 253 (3d Cir. 2012) (alteration in original) (quotation omitted).  Thus, a finding that a student received a FAPE under the IDEA "is equally dispositive" of a plaintiff's § 504 claim.  Id.  Accordingly, where, as here, we affirm the ALJ's decision that the District provided A.W. with a FAPE, we also conclude that the ALJ did not err in entering judgment against Parents on their § 504 claim.

## IV.    CONCLUSION

For the foregoing reasons, we grant the District's Motion for Summary Judgment, deny

Parents' Motion for Judgment on the Administrative Record, affirm the ALJ's decision, and enter

judgment in favor of the District and against Parents.[12]   An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.

John R. Padova, J.

---

[12] In the last sentence of their Memorandum in Support of their Motion for Summary Judgment, the District requests, without elaboration, that we award them attorneys' fees.  The IDEA permits a court, in its discretion, to award reasonable attorneys' fees to a prevailing local educational agency against a parent's attorney who files an "action that is frivolous, unreasonable, or without foundation," or who "continue[s] to litigate after the litigation clearly became frivolous, unreasonable, or without foundation."  20 U.S.C. § 1415(i)(3)(B)(i).  It also permits an award of attorneys' fees against either the parent or the parent's attorney if the action "was presented for any improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation."  Id.  Here, the District does not state the basis on which it seeks attorneys' fees or specify who it seeks to hold liable for such fees.  Moreover, we do not independently find this to be a case in which attorneys' fees would be appropriate.  Accordingly, we deny the District's Motion insofar as it seeks attorneys' fees.